IN THE CIRCUIT COURT OF TALLAHATCHIE COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

M & W FARMS, MOORE FARMS
PARTNERSHIP, MURRAH B.
HARDY, JR., T & R FARMS,
BERRY ANN ALLISON,
SUNNYSIDE PLANTING CO.,
NATHAN LITTLE, TANSIL PORTER
d/b/a PORTER FARMS, HUBERT
WOLFE d/b/a HIGH POINT PLANTING
CO., V & K FARMS, EDWARD E.
SHOOK, JAMIE HOLEMAN, KELSIE
FENNELL TRIBBLE, D & J FARMS,
CARTY AND ASHLEY TILLMAN
FARMS, TWIN BAYOU FARMS, and
CLINT ALLISON d/b/a CLINT
ALLISON FARMS

USDC No. 3:23CV53-MPM-RP

PLAINTIFFS

V.

CAUSE NO.: _CV 23 - 9 S M 72_

UMB BANK, N.A. and HORNE LLP

DEFENDANTS

## COMPLAINT

COME NOW Plaintiffs M & W Farms, Moore Farms Partnership, Murrah B. Hardy, Jr., T

& R Farms, Berry Ann Allison, Sunnyside Planting Co., Nathan Little, Tansil Porter d/b/a Porter

Farms, Hubert Wolfe d/b/a High Point Planting Co., V & K Farms, Edward E. Shook, Jamie

Holeman, Kelsie Fennell Tribble, D & J Farms, Carty and Ashley Tillman Farms, Twin Bayou

Farms, and Clint Allison d/b/a Clint Allison Farms (collectively, "Plaintiffs"), and bring this action

against Defendants UMB Bank, N.A. ("UMB") and Horne LLP ("Horne") (collectively,

"Defendants") and state the following:

## INTRODUCTION

1.      This case arises from a scam foisted on Mississippi farmers doing business with

Express Grain Terminals, LLC ("Express Grain" or "EGT"), an insolvent Mississippi grain dealer.

Express Grain perpetrated this fraud on Plaintiffs and its other customers by making affirmative



FILED
TALLAHATCHIE COUNTY MS- 2ND DISTRICT
DATE  2-10-2023
DAPHANE NEAL- CIRCUIT CLERK
BY-DC

representations about its financial stability while it was teetering on the brink of financial ruin. In order to collect fees, Defendants provided banking and accounting services that enabled and sustained Express Grain's fraud and turned a blind eye to Express Grain's impending collapse. Without Defendants' services, the Express Grain scheme could not have succeeded. Defendants furthered Express Grain's fraud by lending credibility to the misrepresentations Express Grain was making to farmers, including Plaintiffs.

2.      Plaintiffs relied on these misrepresentations and, as a result, suffered damages.

## PARTIES

3.      Plaintiff M & W Farms is a Mississippi general partnership with its principal place of business in Tallahatchie County, Mississippi. Plaintiff M & W Farms engaged in farming operations in Leflore and Tallahatchie Counties. Plaintiff M & W Farms sold and/or delivered for storage approximately 35,878 bushels of corn to Express Grain in August of 2021. Plaintiff M & W Farms was not paid by Express Grain for its corn.

4.      Plaintiff Moore Farms Partnership ("Plaintiff Moore Farms") is a Mississippi general partnership with its principal place of business in Greenwood, Leflore County, Mississippi. Plaintiff Moore Farms engaged in farming operations in Yalobusha and Tallahatchie Counties, Mississippi. Plaintiff Moore Farms sold and/or delivered for storage approximately 35,400 bushels of corn and approximately 4,992 bushels of soybeans to Express Grain in September of 2021. Plaintiff Moore Farms was not paid by Express Grain for its corn or soybeans.

5.      Plaintiff Murrah B. Hardy, Jr. ("Plaintiff Hardy") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 8764 Sharkey Road, Charleston, Mississippi 38921. Plaintiff Hardy engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff Hardy sold and/or delivered for storage approximately 10,204.15 bushels of

2

soybeans to Express Grain in September of 2021. Plaintiff Hardy was not paid by Express Grain for his soybeans.

6.      Plaintiff T & R Farms is a Mississippi general partnership with its principal place of business in Tallahatchie County, Mississippi. Plaintiff T & R Farms engaged in farming operations in Tallahatchie County. Plaintiff T & R Farms sold and/or delivered for storage approximately 39,810.07 bushels of soybeans to Express Grain in September of 2021. Plaintiff T & R Farms was not paid by Express Grain for its soybeans.

7.      Plaintiff Berry Ann Allison ("Plaintiff Allison") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 1788 Tippo Road, Cascilla, Mississippi 38920. Plaintiff Allison engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff Allison sold and/or delivered for storage approximately 712.49 bushels of soybeans to Express Grain in September of 2021. Plaintiff Allison was not paid by Express Grain for her soybeans.

8.      Plaintiff Sunnyside Planting Co. ("Plaintiff Sunnyside Planting") is a Mississippi general partnership with its principal place of business in Tallahatchie County, Mississippi. Plaintiff Sunnyside Planting engaged in farming operations in Leflore and Tallahatchie Counties, Mississippi. Plaintiff Sunnyside Planting sold and/or delivered for storage approximately 25,530.15 bushels of soybeans to Express Grain in September of 2021. Plaintiff Sunnyside Planting was not paid by Express Grain for its soybeans.

9.      Plaintiff Nathan Little ("Plaintiff Little") is an adult resident of Bolivar County, Mississippi, whose residence address is 3894A Hwy 61 North, Cleveland, Mississippi 38732. Plaintiff Little engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff Little sold and/or delivered for storage approximately 1,466.68 bushels of soybeans to Express Grain in September of 2021. Plaintiff Little was not paid by Express Grain for his soybeans.

10.     Plaintiff Tansil Porter d/b/a Porter Farms ("Plaintiff Porter Farms") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 3304 Forty Mile Bend Road, Philipp, Mississippi 38950. Plaintiff Porter Farms engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff Porter Farms sold and/or delivered for storage approximately 1,768.56 bushels of soybeans to Express Grain in September of 2021. Plaintiff Porter Farms was not paid by Express Grain for its soybeans.

11.     Plaintiff Hubert Wolfe d/b/a High Point Planting Co. ("Plaintiff High Point Planting") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 5824 Leverette Lane, Cascilla, Mississippi 38920. Plaintiff High Point Planting engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff High Point Planting sold and/or delivered for storage approximately 8,283.95 bushels of corn to Express Grain in September of 2021. Plaintiff High Point Planting was not paid by Express Grain for its corn.

12.     Plaintiff V & K Farms is a Mississippi general partnership with its principal place of business in Tallahatchie County, Mississippi. Plaintiff V & K Farms engaged in farming operations in Grenada and Tallahatchie Counties, Mississippi. Plaintiff V & K Farms sold and/or delivered for storage approximately 4,211.60 bushels of soybeans to Express Grain in September of 2021. Plaintiff V & K Farms was not paid by Express Grain for its soybeans.

13.     Plaintiff Edward E. Shook ("Plaintiff Shook") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 2448 Government Road, Tutwiler, Mississippi 38963. Plaintiff Shook engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff Shook sold and/or delivered for storage approximately 488.89 bushels of soybeans to Express Grain in September of 2021. Plaintiff Shook was not paid by Express Grain for his soybeans.

4

14.     Plaintiff Jamie Holeman ("Plaintiff Holeman") is an adult resident of Leflore County, Mississippi, whose residence address is 206 Frederick Road, Minter City, Mississippi 38944. Plaintiff Holeman engaged in farming operations in Leflore and Tallahatchie Counties, Mississippi. Plaintiff Holeman sold and/or delivered for storage approximately 802.02 bushels of soybeans to Express Grain in September of 2021. Plaintiff Holeman was not paid by Express Grain for his soybeans.

15.     Plaintiff Kelsie Fennell Tribble ("Plaintiff Tribble") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 5549 MS Hwy 8, Philipp, Mississippi 38950. Plaintiff Tribble engaged in farming operations in Tallahatchie, Leflore and Grenada Counties, Mississippi. Plaintiff Tribble sold and/or delivered for storage approximately 22,046.49 bushels of soybeans to Express Grain in September of 2021. Plaintiff Tribble was not paid by Express Grain for his soybeans.

16.     Plaintiff D & J Farms ("Plaintiff D & J Farms") is a Mississippi general partnership with its principal place of business in Tallahatchie County, Mississippi. Plaintiff D & J Farms engaged in farming operations in Tallahatchie, Mississippi. Plaintiff D & J Farms sold and/or delivered for storage approximately 10,502.71 bushels of soybeans to Express Grain in September of 2021. D & J Farms was not paid by Express Grain for its soybeans.

17.     Plaintiff Carty and Ashley Tillman Farms ("Plaintiff Tillman Farms") is a Mississippi general partnership with its principal place of business in Leflore County, Mississippi. Plaintiff Tillman Farms engaged in farming operations in Tallahatchie, Leflore and Carroll Counties. Plaintiff Tillman Farms sold and/or delivered for storage approximately 12,186.80 bushels of soybeans to Express Grain in September of 2021. Plaintiff Tillman Farms was not paid by Express Grain for its soybeans.

5

Case: 3:23-cv-00053-MPM-RP Doc #: 2 Filed: 03/09/23 6 of 27 PageID #: 402


18.     Plaintiff Twin Bayou Farms is a Mississippi general partnership with its principal place of business in Leflore County, Mississippi. Plaintiff Twin Bayou Farms engaged in farming operations in Tallahatchie and Leflore Counties. Plaintiff Twin Bayou Farms sold and/or delivered for storage approximately 8,394.37 bushels of soybeans and 86,141.99 bushels of corn to Express Grain in August and September of 2021. Plaintiff Twin Bayou Farms was not paid by Express Grain for its soybeans or corn.

19.     Plaintiff Clint Allison d/b/a Clint Allison Farms ("Plaintiff Allison Farms") is an adult resident of Tallahatchie County, Mississippi, whose residence address is 7783 Tippo Road, Cascilla, Mississippi 38921. Plaintiff Allison Farms engaged in farming operations in Tallahatchie County, Mississippi. Plaintiff Allison Farms sold and/or delivered for storage approximately 1,601.74 bushels of soybeans to Express Grain in September of 2021. Plaintiff Allison Farms was not paid by Express Grain for its soybeans.

20.     Defendant UMB Bank, N.A. is a national banking association with its principal place of business in Kansas City, Missouri. The bank had assets in excess of $33 billion dollars as of 2020 and holds itself out as having particular expertise in agricultural finance.

21.     Defendant Horne LLP is a Delaware Limited Liability Partnership with its principal place of business located at 661 Sunnybrook Road, Suite 100, Ridgeland, Mississippi 39157. The state of residence of the majority of the equity partners of Horne LLP is Mississippi.

## JURISDICTION AND VENUE

22.     Jurisdiction and venue are appropriate in this Court because (1) Plaintiffs and at least one of the named Defendants are residents of Mississippi (2) (a) a substantial part of the unlawful actions and the tortious conduct complained of occurred in Tallahatchie County and (b) substantial events that caused the alleged injuries occurred in Tallahatchie County.

6

## FACTUAL ALLEGATIONS

### A. Relevant Factual Background of EGT's Grain Elevator Operations Prior to Bankruptcy.

23.     Until it entered into bankruptcy[1] in September 2021, EGT operated one of the largest grain dealer operations serving farmers in the Mississippi Delta. EGT purchased and stored grain from Mississippi farmers and sold that grain on the open market. EGT operated massive storage facilities as well as a related soybean processing facility in Leflore County, Mississippi.

24.     In the typical EGT grain purchase, upon delivery of grain to the elevator title to the grain would be transferred to EGT. EGT would then weigh, inspect, and unload the grain, and deliver payment in the form of a check to the farm or farmer who delivered the grain.

25.     The operation of a grain elevator has seasonal ebbs and flows of grain with corresponding cash needs. At harvest time, EGT's cash needs increased, as it required liquidity to pay farmers for their crops. Occasionally, EGT would pay farmers upon delivery, but usually EGT and farmers agreed to delay payment.

26.     During the harvest season – late August and September for corn, through the end of October for soybeans – the silos would fill up as farmers deposited their harvests at EGT. Peak flows occur at the end of September. The rest of the year the silos operated at less than full capacity.

27.     EGT operated in a competitive product market. Although it was a significant player in the market, it faced real competition from other silos. Farmers could sell their grain elsewhere. EGT therefore had to compete with other silos in terms of price, flexibility of terms, efficiency, timing, and security. To remain competitive, EGT fraudulently solicited farmers with offers of

---

[1] *Express Grain Terminals, LLC*; Case No. 21-11832-SDM (Bankr. N.D. Miss. Sept. 9, 2021) ("the Bankruptcy").

above market premiums and painted a positive picture of its financial stability, with rosy forecasts throughout 2021.

28.     In 2021, among other modes of communication, including email and radio advertisements, EGT sent agents and employees to the farmers in the fields, including in Tallahatchie County, to solicit business and enter contracts with farmers, by making false statements to the farmers about EGT's financial conditions and promising them higher rates per bushel to bring their grain in early. Plaintiffs relied on these false statements to their detriment.

29.     EGT is subject to financial regulation by the Mississippi Department of Agriculture and Commerce (the "MDAC"). The MDAC is statutorily obligated to protect the interest of farmers by monitoring the financial well-being of operators of grain dealers and warehouses. If an operator is not sufficiently solvent or presents a substantial financial risk to those farmers who do business with it, the MDAC will revoke the dealer/warehouseman's license, shutting the grain terminal down.

30.     Farmers, including Plaintiffs, rely heavily on MDAC's licensing and oversight to determine whether it is safe to do business with a grain dealer. It is understood by farmers, including Plaintiffs, and those engaged in agricultural finance (including Defendants), that information provided to the MDAC concerning grain dealers is relied upon by farmers in their specific transactions with the grain dealers, and in grain transactions generally. The Mississippi statutory and regulatory scheme makes the farmers, including Plaintiffs, the beneficiary of MDAC's regulatory powers. MDAC acts on behalf of farmers.

**B. Defendants Knew Express Grain's Financial Condition was Dire.**

    **1. Defendants had access to EGT's financial records.**

31.    UMB was EGT's primary lender. Through this relationship, UMB had detailed knowledge of EGT's years long deteriorating financial condition. This included receiving audits and financial statements of EGT's finances from EGT's accountant, Horne.

32.    Horne likewise possessed intimate knowledge of EGT's financial status. Horne was responsible for producing financial statements required to be furnished to the MDAC and UMB. As EGT's auditor and accountant, Horne had complete and unfettered access to all EGT's records, including financial, regulatory and banking records and correspondence.

33.    EGT's business operations were conducted through UMB bank accounts. The lending relationship between EGT and UMB allowed UMB to inspect EGT's financial books and records at any time. The lending relationship also required periodic financial reporting to UMB by EGT.

34.    UMB and Horne have long recognized EGT's financial condition as troubling. Beginning with the 2018 audit, EGT's Chief Executive Officer John Coleman ("Coleman") prepared counterfeit Horne-audited financial statements for the MDAC.

35.    But even the fake audits demonstrated that EGT had lost money every year for four of the last five years of its operations: in 2017 losses of $2.4M; in 2018 losses of $2.7M; and in 2020 EGT losses of $1.8M.[2] EGT's losses in 2021 are not posted.

36.    Coleman's fake audits also reflected that cash on hand decreased from $1.2M in 2018 down to $641,000 in 2019, and then to almost zero in 2020 at $3,865. The fake audits also displayed a dismal picture of EGT's current assets:

---

[2] In 2019, the fake audit showed a gain of $2.2M.

37.     As of December 30, 2017, EGT's current asset account was a little above $38M. Current assets also declined steadily; by December 2018, the current assets had dropped to $29M; in 2019 current assets decreased to $28M in December 2019; and by mid-2020, the account was down to $11M.[3]

38.     Because of their business relationships with EGT, UMB and Horne were aware of the massive decline in income, year-over-year cash on hand, and decline of current assets. As a result, Horne stated in its audited financial statements that there was substantial doubt that EGT could continue as a going concern for all years from 2018-2021. Coleman removed Horne's going concern statement from EGT's submissions to the MDAC. Horne never performed any investigation as to why EGT continued to receive a warehouse license in spite of Horne's designation of EGT as a going concern.

39.     Despite knowing of EGT's financial decline and inability to meet its obligations, UMB continued to lend money to EGT without disclosing the truth of EGT's financial condition to anyone, including Plaintiffs, other farmers, or the MDAC.

### 2. Defendants Were on Notice of Other Suspicious Business Activity.

40.     Defendants were also on notice that the owners of EGT would frequently deposit substantial amounts of money into EGT's accounts and withdraw the same amount from the account over the next few days.

41.     Any reasonable independent auditor or lender should recognize that behavior as a sign of a desperate cash shortage and impending ruin.

---

[3] A current asset is a thing of value that can be readily and efficiently converted to cash within twelve months.

### C. Horne Had a Duty To Withdraw as EGT's Auditor, but Instead Turned a Blind Eye to EGT's Fraud.

42.     Horne is an independent public auditor, a member of a profession regarded as a public watchdog. The purpose of having an independent accounting firm certify the financial statement and annual report of a corporation is to provide independent certification of the truth of financial reports for those who must rely upon such reports.

43.     An independent auditor is under a legal duty to all parties who may be reasonably harmed by its negligence or fraud to exercise mature and faithful critical thinking and judgment while performing its audit responsibilities.

44.     Investors, regulators, and creditors routinely rely upon annual audits. Independent public auditors serving in such a capacity have, therefore, obligations beyond the immediate interests of their paying clients. Those duties extend to all reasonably foreseeable persons who may be harmed by the auditor's negligence, fraud, or reckless disregard of their duties.

45.     At the hub of EGT's fraud was manipulation of its inventory reporting. John Coleman and EGT regularly sold fictitious grain. UMB alleged in its Receivership Complaint[4] of September 28, 2021, that EGT overstated its inventory position in the amount of $42M as of the Receivership Complaint date.

46.     A Warehouse Receipt transfers the title of grain and represents grain in storage. As early as June 2020, John Coleman and EGT created Warehouse Receipts for grain that did not exist. Coleman and EGT sold these Warehouse Receipts (and the fictitious grain they represented) to so-called "repo-lenders" such as FCStone and Macquarie. Coleman and EGT would then often purchase the Receipts back from the repo-lenders a short time later. Coleman and EGT used the

---

[4] *UMB Bank, N.A. v. Express Grain Terminals, LLC, et al.*, No. 21-CV-106 (Chancery Ct. Leflore Cnty. Miss.) (the "Receivership").

sale and repurchase of the fictitious grain and Warehouse Receipts as a short-term source of credit to generate operating capital. The differential between the sales price and the lesser repurchase price was, in effect, constructive interest on the funds. At all material times, Defendant UMB had actual or constructive knowledge of Coleman's and EGT's sale of fictitious grain. Defendant UMB aided and abetted the fraud because the scheme provided a source of operating capital that enhanced and strengthened UMB's position as a secured lender.

47.     This over-statement of inventory long pre-dated the UMB Receivership Complaint. EGT simply filled in the blanks on a Warehouse Receipt, and soybeans magically appeared, money for nothing. Even the most simplistic and elementary audit would have revealed the chicanery.

48.     At all material times, Defendants UMB and Horne were aware (or in the exercise of reasonable care should have been aware) of EGT's fraudulent transactions in non-existent grain and lack of internal inventory and accounting controls.

49.     A review of public records (the Receivership Complaint and court papers filed in the Bankruptcy Adversary Proceedings against John Coleman[5]) show that EGT sold (*i.e.*, issued Warehouse Receipts for) more beans than it has on hand. Taken together, these two public filings show:

  a.  On May 31, 2021, EGT had 2,025,410 bushels of soybeans in its bins and had previously issued Warehouse Receipts to FCStone and Macquarie for 5, 080,000 bushels, representing 3,054,590 fake bushels.

  b.  On July 21, 2021, EGT had 2,238,359 bushels of soybeans in its bins and had previously issued Warehouse Receipts to FCStone and Macquarie for 4,430,000 bushels, representing 2,191,641 fake bushels.

---

[5] *UMB Bank, N.A. v. John Coleman*, No. 1:22-ap-1001 (Bankr. N.D. Miss.) ("Adversary Proceedings").

50.    Additionally, Generally Accepted Auditing Standards ("GAAS") require the auditor to notify the Board of Directors or other entity charged with governance of material weakness in internal financial and accounting controls.

51.    Horne's reasonable course or obligation was to either render a disclaimer of EGT's financial statements noting that it was unable to perform an audit in accordance with GAAS or to resign as auditor.

52.    Either approach would have resulted in EGT being out of compliance with its licensing requirements with the MDAC, pursuant to Miss. Code Ann. § 75-44-43 and MDAC regulations, including §102.03. Pursuant to Mississippi law, Horne had a duty to submit sworn financial reports to MDAC, but Horne never did.

53.    Horne's failure to render a disclaimer, resign as auditor, and to submit sworn and certified financial reports to MDAC in 2021 all proximately contributed to Plaintiffs' damages.

**§75-44-43. Annual inspection of warehouse financial statement**

(2) Every grain warehouse shall at least annually send to the commissioner a copy of *its financial statement prepared by an accountant licensed by the State of Mississippi and sworn to by the accountant and grain warehouseman.*

(3) *The commissioner may, in his discretion, require an unqualified audit by an accountant licensed by the State of Mississippi as a requirement for licensing*, and inspect the grain warehouse's business, mode of conducting the same, facilities, equipment, inventories, property, books, records, accounts, papers and minutes of proceedings held at such grain warehouse, and any other records deemed relevant to the operation of the grain warehouse by the commissioner.

Licensing Requirements

102.03 Each application for license or renewal thereof shall be accompanied by a *financial statement prepared by an independent public accountant* and the grain warehouseman.   The accountant, in addition to preparing the financial statement, much check *and certify the accuracy of the accounts receivable and listed inventories.*

54.    Horne knew or should have known of EGT's weakness in internal financial and accounting controls but failed to resign or withdraw as EGT's auditor. Withdrawal as auditor

would have prevented EGT from obtaining licensure as a grain dealer. Lack of licensure would have closed EGT's doors long before Plaintiffs delivered their 2021 crops to EGT.

55.     Thus, during the performance of its audit in 2021, had Horne withdrawn upon realizing it could not properly certify the audit under GAAS standards, EGT would not have been a licensed grain dealer, and farmers, including Plaintiffs, would have taken their grain elsewhere.

56.     Horne's most recent engagement letter with EGT was dated April 1, 2021. This engagement letter contemplated a retroactive look-back review of EGT's financial records to determine the risks of material misstatement in the financial statements whether due to fraud or error.

57.     This auditor's look-back at EGT's financial statements encompassed the six months ending December 31, 2020. Although Horne and EGT had no engagement letter or retainer contract covering business operations after December 31, 2020, the engagement letter contract dated April 1, 2021 allowed Horne unlimited and complete access to EGT's financial records sufficient to perform the six month 2020 audit as well as access to all of EGT's records after December 31, 2020 through September 29, 2021.

58.     Defendant Horne completed the audit on August 30, 2021, about four weeks before EGT sought bankruptcy protection on September 29, 2021. The Horne audit addressed "subsequent events" through that date.

59.     The April 1, 2021 engagement letter proclaimed that under no circumstances would EGT be liable to Horne:

> Notwithstanding any other provision of this engagement letter, neither party, nor their respective officers, agents, servants and employees, shall be liable to the other party for lost profits or punitive damages or for any special, indirect, incidental or consequential damages in any way arising out of this engagement however caused or based on any theory of liability

14

(including, but not limited to: contract, tort or warranty) even if advised of
the possibility of such damages.

60.    Thus, Defendant Horne's wrongs complained of herein occurred either during the
pendency of a written engagement letter dated April 1, 2021 covering the last six months of 2020
through and including the completion and "subsequent event" date of August 30, 2021; or, during
the tenure of an implied contract allowing full and wide open access to EGT's 2021 financial
records. Defendant Horne's many tortious failings proximately caused Plaintiffs to suffer damages
and financial losses in Tallahatchie County beginning September 29, 2021.

61.    Because Express Grain had no Board of Directors, a reasonable practice would
have been for Horne to notify the only "upstairs" authority, the regulatory body MDAC. Such
notice would have been consistent with Horne's status as a public watchdog and would have also
been consistent with the language and purpose of the Mississippi regulatory framework that
required the public watchdog accountants to submit a sworn and certified financial statement.

62.    Against this regulatory backdrop, with full actual knowledge of the oversight role
the Mississippi legislature had conferred upon MDAC, it was irresponsible and grossly negligent
*per se* for Horne, the public watchdog, to fail to swear and certify to MDAC the true nature of
EGT's fraudulent transactions in Warehouse Receipts.

63.    It was irresponsible and grossly negligent *per se* for Horne to fail to inform MDAC
of the material weaknesses in EGT's internal inventory controls.

64.    Further, it was irresponsible and grossly negligent for Horne to fail to withdraw
from its role as EGT's auditor.

65.    This gross negligence aided and abetted EGT in its fraudulent scheme.

66.    Horne's negligence *per se* and negligent failure to withdraw from the audit
assignment proximately caused loss and damages to Plaintiffs.

15

67.     Horne's negligent failure to withdraw aided and abetted EGT's fraudulent scheme.

68.     No reasonably prudent CPA firm would have accepted the audit assignment to replace Horne because of the circumstances of Horne's withdrawal.

69.     Had Horne withdrawn, a step it had a professional and legal duty to take, the EGT fraud would have ended. This end would have come because EGT could not have procured a performance bond, a prerequisite for licensure. Lack of licensure would have closed EGT's doors before Plaintiffs delivered their crops to EGT.

### D.  UMB Continued to Enable EGT's Fraud and Lied to the MDAC About EGT's Financial Condition

70.     UMB was likewise on notice that EGT's finances were collapsing.

71.     With Horne's enablement and assistance, EGT and UMB refinanced their loan agreement five times during a six-month period beginning in December 2020 as follows: 1) Fourth Amended Loan Agreement December 17, 2020; 2) First Amendment to Fourth Amendment February (day undated) 2021; 3) Second Amendment to Fourth Amendment April 30, 2021; 4) Third Amendment to Fourth Amendment May 31, 2021; and 5) Fourth Amendment to Fourth Amendment June 30, 2021.

72.     As of June 30, 2021, UMB and EGT had eliminated the pay-down schedule, leaving the loan balance at $40M instead of the $25M balance required in the original agreement.

73.     Horne and UMB knew or should have recognized that the loan agreement was "non-performing."

74.     UMB's efforts to prop up EGT extended to falsely vouching to regulators that all was well. In December of 2020, the MDAC received a complaint from a farmer who had not been paid by EGT. An MDAC investigator contacted EGT, which gave the investigator assurances that

its financial condition was just fine, and that EGT was simply refinancing its debts in the ordinary course of business. EGT then invited the investigator to contact UMB to confirm that report.

75.   The MDAC investigator accordingly contacted UMB for assurances about EGT's financial health. The UMB officer, Mark Reinert, told the MDAC investigator that EGT's loans were simply being refinanced as a matter of ordinary business and that everything at EGT was just fine. UMB's representations to the MDAC were false.

76.   The MDAC, acting as *de facto* agent for the farmers and on their behalf, relied on UMB's verification of EGT's misrepresentations and allowed EGT to remain open as a grain dealer and warehouse.

77.   UMB's misrepresentations were made to prevent EGT from being shut down and to permit EGT to enter another season of harvest to increase collateral. UMB, which specializes in agribusiness lending, fully understood the need to make such assurances to the agency.

78.   UMB's misrepresentation foreseeably allowed it to take possession of farmers grain without payment and take the proceeds of liquidation in the Bankruptcy.

79.   But for UMB's deliberate misrepresentation, the MDAC would have suspended EGT's license, forcing it out of business and 200+ Mississippi farmers would not have sustained losses of millions of dollars.

**E. Defendants Aided and Abetted Express Grain in Fraudulently Touting its Financial Health to Farmers and Aggressively Soliciting Grain Deliveries**

80.   In the spring of 2021, EGT issued a "spring update" that made sunny predictions about the future of the company. EGT began by stating that there were "some exciting things going on here at Express Grain" touting that EGT "continue[d] with [its] growth and expansion" and affirmed that "we are able to continue to meet your needs and improve our services." The update

17

touted expansion to EGT's soybean processing plant. It touted high market prices for corn and

soybeans, and demand for soybean oil. Most importantly, it touted its own financial condition:

> We are excited to see another crop go in the ground. We are looking forward to another busy fall, and *this time we'll be more prepared financially* having moved our fiscal year to the calendar year as opposed to June 30. June 30 is good physical cutoff for old/new crop, but the calendar fiscal year will give us more time to have our inventory financing secured and in place in time for harvest, so things will run like normal. We all have a lot to look forward to this coming year. Let's make the most of it!

(Emphasis added).

81.    As late as September 28, 2021 (the day before EGT filed for bankruptcy), EGT sent

an email to customers that reassured them of the solvency and its ability to pay for grain deliveries:

> Express Grain Customers and Friends,
>
> I hope everyone is having a great harvest this year. I wanted to update you all on how we are doing. This harvest Express Grain has received approximately 7.5 million bushels of corn! This is the 2nd largest in our history just behind 2013. A lot of this was made possible due to the inverted market and high moisture harvesting program. We have shipped approximately 6.5 million bushels of corn out to the market. We have to thank the CN railroad for doing an excellent job of keeping trains rolling in and out of our Sidon Facility, and for you getting it out of the field! We are so thankful a large portion got their corn out of the field and to market before the Hurricane. Soybeans are rolling in as well. Due to issues with the river this year, we are definitely going to see more bushels come our way. We are steadily crushing beans, and will start shipping trains of beans so we have ample space for everyone. *I also wanted to let you know that we are in good shape financially. We have funding in place from multiple sources to make sure everyone gets paid on time. Stay safe out there and keep those combines rolling!*
>
> Sincerely,
> John Coleman
> President
> Express Grain Terminals

82.    At the time EGT made the foregoing representations, Defendants knew or should

have known that these public pronouncements and solicitations were false, as EGT was teetering

on bankruptcy, yet Defendants remained silent, knowing that these misrepresentations would

induce farmers to deliver their crops to EGT.

18

83.     Defendants had superior knowledge about EGT's financial condition than Plaintiffs, knew that EGT's financial condition was dire, and that EGT would be unable to pay for the voluminous grain deliveries it would receive in harvest season.

84.     Defendants had a duty to disclose the adverse financial condition of EGT to Plaintiffs and to the MDAC because (1) this information was necessary and material to transactions entered by farmers with EGT; (2) was necessary to correct false statements about EGT's financial condition; and (3) Defendants had special knowledge about these facts that Plaintiffs and the other farmers did not have.

85.     Hundreds of Mississippi farmers, including Plaintiffs, relied to their detriment on the purported financial health and vitality of EGT. If Plaintiffs had known of EGT's inability to pay, they would not have delivered their grain to EGT.

86.     Due to EGT's affirmative misrepresentations and Defendants' omissions about EGT's financial condition, Plaintiffs continued to deliver grain to EGT during the fall harvest season.

87.     Plaintiffs in this case delivered approximately 165,703.94 bushels of corn and 143,450.60 bushels of soybeans during the 2021 harvest season, for which they are owed a total of approximately $2,830,418.11.

88.     Only UMB benefitted from the delivery of additional collateral that it could later foreclose upon.

**F.  UMB Reaps the Benefits of EGT's Collapse**

89.     On September 24, 2021, UMB gave notice to EGT that it had "elected to accelerate the Indebtedness and declared all amounts owing under the Loan Documents immediately due and payable in full."

90.     On or about September 28, 2021, the Bank filed the Receivership Complaint seeking the appointment of a receiver over EGT. By filing the Receivership, UMB furthered its scheme to take possession of farmers' unpaid grain and/or its proceeds. UMB wrongfully exercised dominion and control over the grain and its proceeds as the Receivership Complaint implemented UMB's plan to take possession of the grain, sell it, and keep the proceeds for itself.

91.     UMB knew that its filing of the Receivership Complaint would force EGT to seek the protection of the bankruptcy laws.

92.     On or about September 29, 2021, EGT and its related entities filed a series of petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Mississippi.

93.     Plaintiffs were required to hire bankruptcy counsel, thereby incurring additional damages.

94.     In short, Defendants had notice of the nuts and bolts of EGT's scheme: years of financial statements which showed evidence of imminent financial failure; repeated reassurances by EGT of financial stability to farmers and the State of Mississippi, EGT's regulator; assurances to farmers and the State of Mississippi that EGT was simply conducting ordinary refinancing in order to avoid the loss of licensure and, actual or constructive knowledge that Express Grain was trading in non-existent grain as a means to raise operating capital.   Defendants had unique information from which they should have reached only one reasonable conclusion; that EGT had long been failing and would cause Defendants substantial loss if Defendants did not act.

95.     Defendants could have stopped the fraud, but instead chose to enable and sustain it by providing banking and accounting services that gave EGT the ability to continue to do business.

By their silence, Defendants gave EGT cover while they each collected fees for the facilitation of a fraudulent scheme.

## COUNT I - AIDING AND ABETTING FRAUD

96.     Plaintiffs incorporate by reference the allegations set forth above as if set forth fully herein.

97.     EGT with the aid and approval of UMB intentionally and unlawfully made knowingly false statements and misrepresentations to the MDAC and farmers, including Plaintiffs. UMB had a duty to disclose these false statements and misrepresentations to the MDAC and farmers, including Plaintiffs. UMB intentionally omitted and concealed information that it had a duty to disclose to the MDAC and the farmers.

98.     Horne had a duty to withdraw as EGT's auditor due to EGT's weakness in internal financial and accounting controls, and Horne's issuance of going concern letters from 2018 through year's end 2020.

99.     Horne knew that these letters would be sent to the MDAC for EGT's licensing purposes but did no investigation into why EGT was continually licensed despite its failing financial condition, thereby enabling EGT to obtain its grain warehouse license.

100.     Further, Horne had an additional duty, imposed by law, to submit sworn financial statements to MDAC for the express purpose of verifying the soundness of EGT's finances, but Horne never did. Horne's failure to withdraw as auditor, or submit sworn and certified financial reports to MDAC in 2021 proximately contributed to Plaintiffs' damages.

101.     Defendants knew that EGT's misrepresentations were designed to induce the farm community in general and specifically Plaintiffs' reliance.

102.   EGT's acts and omissions constitute fraud in the inducement and fraudulent misrepresentations. Defendants knew with a high degree of certainty that EGT's conduct constituted fraud and misrepresentation and breached their duties with respect to disclosing such misconduct.

103.   Defendants had known for years of Express Grain's true financial condition yet continued to aid and abet the false appearance of a legitimate viable business by failing to correct the false representations and omissions by EGT, by failing to call EGT's delinquent financial obligations, and by failing to perform required audit procedures and furnish certified sworn reports to the MDAC.

104.   Defendants gave substantial assistance and/or encouragement to EGT and aided and abetted the fraud perpetrated by EGT by affirmatively misrepresenting to the MDAC that Express Grain was in good financial condition, while remaining silent with respect to EGT's insolvency with full knowledge that farmers would deliver their grain without being paid for it, and propping up EGT until such time, and only until such time, as area farmers, including Plaintiffs would deliver their crops.

105.   Despite the fact that Defendants should have acted to prevent such an act of piracy on Plaintiffs, Defendants enabled and sustained EGT and lent legitimacy and cover to Express Grain while farmers including Plaintiffs delivered their crops to EGT only to have them seized as collateral by UMB.

106.   As a direct and proximate result of Defendants aiding and abetting EGT's fraudulent conduct, Plaintiffs have been damaged.

22

## COUNT II – INTENT, NEGLIGENCE, NEGLIGENCE *PER SE* AND GROSS NEGLIGENCE

107.    Plaintiffs incorporate by reference the allegations set forth above as if set forth fully herein.

108.    Defendants either intentionally or negligently, recklessly, and with gross disregard for the truth knowingly made false representations to the MDAC, and to others in the public, including Plaintiffs, intending that these false representations be relied upon by the MDAC, and farmers, including Plaintiffs.

109.    Defendants intentionally omitted and/or concealed information that they had a duty to disclose to the MDAC and to Plaintiffs. Defendants had known for years of the true financial condition of EGT, yet they persisted in cloaking EGT in the costume of a legitimate, sound and viable business operation, thereby allowing Express Grain to continue being licensed by the state of Mississippi and conducting business with farmers, including Plaintiffs.

110.    As EGT's auditor, Horne was responsible for providing sworn financial statements to the MDAC. Horne knew, or should have known, that its financial statements identifying EGT as a going concern would be provided to the MDAC for purposes of EGT's grain warehouse licensing, but Horne did no investigation into why EGT was continually licensed despite its failing financial condition, thereby enabling EGT to obtain its grain warehouse license. Horne never submitted its sworn statement to MDAC as required by law.

111.    Horne had a duty in 2021 to withdraw from representation upon realizing it could not properly certify its audit under GAAS standards.

112.    It was reasonably foreseeable that Defendants' behavior would harm Plaintiffs.

113.    Defendants' conduct, which exhibited recklessness, intent, gross negligence, and lack of ordinary care allowed EGT to remain licensed so Defendants could continue collecting

fees and collateral in the form of the Plaintiffs' grain. As a direct and proximate result of Defendants' behavior in disguising the true condition of EGT, Plaintiffs were deceived and robbed of their crop.

114.    If Defendants had complied with their duties and the law, the MDAC would have suspended EGT's license and stopped the operations of EGT, and Plaintiffs would have sold their grain elsewhere.

115.    Defendants owed a duty to disclose EGT's true financial condition to Plaintiffs. Defendants breached that duty by failing to disclose EGT's financial condition to the MDAC. As a result, Plaintiffs suffered damages.

## COUNT III – NEGLIGENT MISREPRESENTATION

116.    Plaintiffs incorporate by reference the allegations set forth above as if set forth fully herein.

117.    Plaintiffs, as members of the public, relied on Defendants' misrepresentations to the MDAC and to the public in general. These misrepresentations and omissions were false and material.  Defendants knew they were false or they acted with reckless disregard for their veracity.

118.    Defendants intended for the MDAC, Plaintiffs, and the farming community to rely upon the misrepresentation as set forth above.

119.    Plaintiffs did not know of their falsity and relied on the status of EGT as a duly licensed and state regulated entity and its false representation to their direct and proximate injury and damage.

120.    Defendants intentionally, grossly negligently, or negligently omitted and/or concealed information that they had a duty to disclose. As a result, Plaintiffs suffered damages.

24

## COUNT IV – UNJUST ENRICHMENT

121.    Plaintiffs incorporate by reference the allegations set forth above as if set forth fully herein.

122.    Defendants' misrepresentations were designed to perpetuate EGT's existence and thereby induced Plaintiffs' reliance upon its financial stability. Plaintiffs did in fact rely upon the resulting appearance of stability of EGT to their detriment.

123.    As a result of the representations and/or omissions, Plaintiffs delivered grain to EGT that would not have been delivered there had the truth been known and therefore directly and proximately suffered damages. Defendants were unjustly enriched to Plaintiffs' detriment as Defendants benefited directly from the continuation of Express Grain's status as a going concern by ultimately seizing Plaintiffs' unpaid grain which had been entrusted to the facility and continuing to receive fees for their services.

## DAMAGES

124.    Plaintiffs incorporate by reference the allegations set forth above as if set forth fully herein.

125.    As a direct and proximate result of Defendants' aforesaid misconduct, Plaintiffs seek recovery of all available damages including, but not limited to, compensatory damages for the loss of their crop, the sales proceeds and payments, consequential and incidental damages for their bankruptcy, counsel fees, attorneys' fees for their loss of productivity and time, punitive damages, and exemplary damages.

126.    Plaintiffs further seek forfeiture of all money received by Defendants directly and/or indirectly through the conduct alleged herein. Plaintiffs seek restitution of all illegally obtained or ill-gotten funds and gains by Defendants.

127.    Plaintiffs seek prejudgment interest, post judgment interest, compounded, attorneys' fees, court costs, investigative costs, expert witness fees, depositions fees, and any other expenses or damages which the Court deems proper.

### JURY TRIAL DEMANDED

Plaintiffs seek and demand a trial by jury on all issues.

DATED this the **10th** day of February 2023.

John W. ("Don") Barrett, Esq. (MSB #2063)
Katherine Barrett Riley, Esq. (MSB #99109)
Sterling Aldridge, Esq. (MSB #104277)
David McMullan, Jr., Esq. (MSB #8494)
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Telephone: (662) 834-2488
Fax: (662) 834-2628
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Bryant W. Clark, Esq. (MSB #100965)
BRYANT W. CLARK LAW, PLLC
Post Office Box 179
Lexington, Mississippi 39095
662.834.6133 (Telephone)
662.834.6136 (Facsimile)
bryant@bryantclarklaw.com

Charlie M. Merkel, Jr., Esq. (MSB #2884)
Christopher W. Winter, Esq. (MSB #10300)
John Cocke, Esq. (MSB #6326)
MERKEL AND COCKE
30 Delta Avenue
Post Office Box 1388
Clarksdale, MS 38614
662 627 9641
cmerkel@merkel-cocke.com
cwinter@merkel-cocke.com

jcocke@merkel-cocke.com

Richard Barrett, Esq. (MSB #99108)
LAW OFFICES OF RICHARD R.
BARRETT, PLLC
2086 Old Taylor Rd., Suite 1011
Oxford, MS 38655
Tel: (662) 380-5018
Fax: (866) 460-5459
rrb@rrblawfirm.net

Jonathan W. Cuneo, Esq.
Monica Miller, Esq.
Jennifer E. Kelly, Esq.
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
monica@cuneolaw.com
jkelly@cuneolaw.com

Michael T. Lewis, Sr. Esq. (MSB #1238)
Pauline Shuler Lewis, Esq. (MSB #1239)
LEWIS AND LEWIS ATTORNEYS
P O Box 2430
Oxford, MS 38655
Tel: (662) 832-8569
mike@lewisattorneys.com
pauline@lewisattorneys.com

Gerald M. Abdalla (MSB # 101213)
ABDALLA LAW, PLLC
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
(601) 278-6055 t
(601) 487-4595 f
jerry@abdalla-law.com

E. Carlos Tanner, III (MSB# 102703)
TANNER & ASSOCIATES, LLC
263 E. Pearl Street
Jackson, Mississippi 39201
Carlos.tanner@thetannerlawfirm.com
601.460.1745 (Telephone)
662.796.3509 (Facsimile)

27